# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

**KAYLA FRIESS, ISSA HADDAD**,
and **MELANIE TIMEUS-McLEROY**,
individually and on behalf of all others
similarly situated,

Civil No. 2:17-cv-14139-DPH-APP

Hon. Denise Page Hood

      Plaintiffs,

v.

**CITY OF DETROIT**, **PIERCE
MONROE & ASSOCIATES, LLC**,
**NORMAN L. WHITE**, and **JAMES
R. CANTY, JR**, jointly and severally,
and in their individual and official
capacities

      Defendants,

---

| | |
|---|---|
| **Godwin Legal Services, PLC** | **City of Detroit Law Department** |
| Shaun P. Godwin | Charles Raimi (P29746) |
| Attorney for Plaintiffs | Eric B. Gaabo (P39213) |
| 450 W. Fort Street, | Attorneys for Defendants City of Detroit, |
| Suite 200 | Norman L. White, and James Canty, Jr. |
| Detroit, MI 48226 | 2 Woodward Avenue, Suite 500 |
| | Detroit, Michigan 48226 |
| **Constitutional Litigation Associates, P.C.** | |
| Cynthia Heenan (P53664) | |
| Hugh M. Davis (P12555) | |
| John C. Philo (P52721) | |
| Co-Counsel for Plaintiffs | |
| 450 W. Fort St., Ste. 200 | |
| Detroit, Michigan 48226 | |

---

# DEFENDANTS CITY OF DETROIT, NORMAN WHITE AND JAMES CANTY'S MOTION FOR JUDGMENT ON THE PLEADINGS

Defendants, the City of Detroit, Norman White and James Canty, Jr. ("the City Defendants"), request that this Honorable Court grant them judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c), because an examination of the pleadings, including the attachments to the City Defendants' Answer to First Amended Complaint and Affirmative Defenses (Doc. 24), discloses that Plaintiffs have failed to state claims on which relief can be granted. The grounds for the City Defendants' motion are shown in greater detail in the attached Brief in Support of Motion for Judgment on the Pleadings.

The City Defendants requested concurrence in the relief requested in this motion, but Plaintiffs declined to do so, making this motion necessary.

/S/ Eric B. Gaabo
Charles N. Raimi (P29746)
Eric B. Gaabo (P39213)
Attorneys for Defendants City of Detroit,
Norman L. White, and James Canty, Jr.
Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 500
Detroit, MI 48226
gaabe@detroitmi.gov
(313) 237-3052

Dated:   August 8, 2018

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

**KAYLA FRIESS, ISSA HADDAD,**
and **MELANIE TIMEUS-McLEROY**,
individually and on behalf of all others
similarly situated,

Civil No. 2:17-cv-14139-DPH-APP

Hon. Denise Page Hood

        Plaintiffs,

v.

**CITY OF DETROIT**, **PIERCE
MONROE & ASSOCIATES, LLC**,
**NORMAN L. WHITE**, and **JAMES
R. CANTY, JR**, jointly and severally,
and in their individual and official
capacities

        Defendants,

---

| | |
|---|---|
| **Godwin Legal Services, PLC** | **City of Detroit Law Department** |
| Shaun P. Godwin | Charles N. Raimi (P29746) |
| Attorney for Plaintiffs | Eric B. Gaabo (P39213) |
| 450 W. Fort Street, | Attorneys for Defendants City of Detroit, |
| Suite 200 | Norman L. White, and James Canty, Jr. |
| Detroit, MI 48226 | 2 Woodward Avenue, Suite 500 |
| | Detroit, Michigan 48226 |
| | |
| **Constitutional Litigation Associates, P.C.** | |
| Cynthia Heenan (P53664) | |
| Hugh M. Davis (P12555) | |
| John C. Philo (P52721) | |
| Co-Counsel for Plaintiffs | |
| 450 W. Fort St., Ste. 200 | |
| Detroit, Michigan 48226 | |

---

# DEFENDANTS CITY OF DETROIT, NORMAN WHITE AND JAMES CANTY'S BRIEF IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

K:\DOCS\LIT\GAABE\A41000\brf\EG6031.WPD

## TABLE OF CONTENTS

Page

STATEMENT OF ISSUES PRESENTED…………………………………………iii

STATEMENT OF MOST CONTROLLING AUTHORITY………………..……v

INTRODUCTION……………………………………………………………..…..1

STATEMENT OF FACTS………………………………………………….……..2

    I.     The Appointment of Kevyn Orr as Detroit Emergency Manager………2

    II.    The City's bankruptcy………………………………………….……2

    III.   Emergency Manager Order No. 24…………………………………...3

    IV.   The Detroit City Council's Ordinance 09-14…………………….......4

    V.    The Bankruptcy Court's approval of the City's changes to its parking fines schedule……………………………………………...…5

    VI.   Emergency Manager Order No. 44 ratifies EM Order 24……………...6

    VII.   The plaintiffs and their parking tickets…………………………………6

    VIII.  The present lawsuit……………………………………..………7

    IX.   Ordinance 04-18 retroactively ratified EM Order 24…………………8

ARGUMENT…………………………………………………………..…..9

    I.     Standards applicable to motions for judgment on the pleadings………..9

    II.    EM Order 24 was lawful and binding…………………………………10

i

A. The Emergency Manager possessed plenary authority over City financial matters, including parking violation fines……………….10

B. Emergency Manager Order No. 24 properly established new parking citation fines…………………………………………………11

C. Ordinance 09-14 did not and could not nullify EM Order 24……..12

III. To the extent there was any doubt whether EM Order 24 lawfully raised parking ticket rates in April 2014, which the City denies, that doubt was erased by the City's 2018 curative ordinance…………14

A. The City's 2018 Ordinance (Ex. B) retroactively cured any possible defect in the implementation of EM Order 24……………14

B. Both Michigan and United States Supreme Court authority expressly authorize enactment of the 2018 curative ordinance……15

IV. Plaintiffs' claims are barred by laches and the *Bigger* doctrine………19

V. Plaintiffs' claims are barred by res judicata or claim preclusion……..23

VI. Counts II (for violation of RICO) and III (for RICO Conspiracy) against Defendants White and Canty fail because (1) there was no unlawful conduct and hence, no "racketeeing activity;" and (2) these are disguised "official capacity" claims against the City……….27

VII. The Court must dismiss Count IV (for Unjust Enrichment) because the City has not been unjustly enriched……………………...32

VIII. The Court must dismiss Count V of Plaintiffs' Amended Complaint, for Assumpsit, because assumpsit has been abolished as an independent cause of action under Michigan law……………………………………………………………………….32

CONCLUSION………….…………………………………………..……33

## STATEMENT OF ISSUES PRESENTED

I.     Should the Court dismiss all of Plaintiffs' claims, where the Emergency Manager possessed plenary authority over City financial matters, including parking violation fines, properly issued Emergency Manager Order 24, which increased the City's parking fines, and the Detroit City Council did not have authority to nullify EM Order 24?

The City Defendants answer "Yes."

II.    Should the Court dismiss all of Plaintiffs' claims, where, to the extent there was any doubt whether EM Order 24 lawfully raised parking ticket rates in April 2014, which the City denies, that doubt was erased by the City's 2018 curative ordinance, which expressly adopted the parking ticket rate increases of EM Order, retroactive to April 2014?

Defendants answer "Yes."

III.   Are all of Plaintiffs' claims barred by laches and the *Bigger* doctrine?

Defendants answer "Yes."

IV.    Are all of Plaintiffs' claims barred by res judicata and/or collateral estoppel?

Defendants answer "Yes."

V.     Should the Court dismiss Counts II (for violation of RICO) and III (for RICO Conspiracy) against Defendants White and Canty fail where (1) there was no unlawful conduct and hence, no "racketeering activity;" and (2) these are disguised "official capacity" claims against the City?

iii

VI.   Should the Court dismiss dismiss Count IV (for Unjust Enrichment) where the City has not been unjustly enriched?

Defendants answer "Yes."

IX.   Should the Court dismiss Count V of Plaintiffs' Amended Complaint, for Assumpsit, because assumpsit has been abolished as an independent cause of action under Michigan law?

Defendants answer "Yes."

## STATEMENT OF MOST CONTROLLING AUTHORITY

In support of the City Defendants' position that the Court must dismiss all of Plaintiffs' claims, where the Emergency Manager possessed plenary authority over City financial matters, including parking violation fines, properly issued Emergency Manager Order 24, which increased the City's parking fines, and the Detroit City Council did not have authority to nullify EM Order 24:

Michigan Public Act 436 of 2012 (PA 436), MCL 141.1541 – 141.1575; *Detroit City Charter, Sec. 4-115*; *People v. Poyma*, 91 Mich. App. 238 (1979).

In support of the City Defendants' position that the Court must dismiss all of Plaintiffs' claims, where, to the extent there was any doubt whether EM Order 24 lawfully raised parking ticket rates in April 2014, which the City denies, that doubt was erased by the City's 2018 curative ordinance, which expressly adopted the parking ticket rate increases of EM Order, retroactive to April 2014:

*Downriver Plaza Group v. City of Southgate, 444 Mich. 656 (1994);* ; *Romein v. General Motors*, 436 Mich. 515 (1990), affirmed in *General Motors Corp v. Romein*, 503 U.S. 181 (1992); *Stott v. Stott Realty Co.*, 288 Mich. 35, 45 (1939); *Jasinski v City of Miami,* 269 F.Supp.2d 1341 (S.D. Fl. 2003).

In support of the City Defendants' position that all of Plaintiffs' claims are barred by laches and the *Bigger* doctrine:

*Bigger v. City of Pontiac*, 390 Mich 1 (1973); *Ford Building v. Wayne County*, 1999 WL 33435466 (Mich. App.); *In re City of Detroit*, 524 B.R. 147,167 (Bankr. ED Mich 2014).

In support of the City Defendants' position that Plaintiffs' claims are barred by res judicata or claim preclusion:

*Coatney v City of Dearborn*, 2009 WL 322032 (E.D. Mich 2009); *Leach v Manning*, 105 F.Supp.2d 707 (E.D. Mich 2000); *Lavrack v City of Oak Park*, 194

F.3d 1313 (6th Cir. 1999); *Costa v City of Detroit*, 2013 WL 318042 (ED Mich 2013).

In support of the City Defendants' position that the Court must dismiss Counts II (for violation of RICO) and III (for RICO Conspiracy) against Defendants White and Canty:

*Cargile v. State of MI*, 2010 WL 3222024 (ED Mich 2010); *Call v Watts*, 142 F.3d 432 (6th Cir. 1998); *Iraheta v Linebarger Goggan Blair & Sampson LLP*, ____ F.Supp.3d ____, 2017 WL 4479953 (S.D. Texas 2017); *Quan v San Franciusco Police Dept.*, 2012 WL 4477621 (N.D. Cal. 2017); *Hirsch v City of New York*, 300 F.Supp 3d 501 (SD NY 2018); *Novel v Zapor*, 2016 WL 6603291 (SD Ohio 2016).

In support of the City Defendants' position that the Court must dismiss Count V of Plaintiffs' Amended Complaint, for Assumpsit:

*Fisher Sand and Gravel Company v. Neal A. Sweebe, Inc.*, 494 Mich. 543, 564; 837 N.W.2d 244 (2013).

**INTRODUCTION**

In April 2014, Detroit Emergency Manager Kevyn Orr issued Emergency Order 24, which increased the fines payable for parking violations in the City, and eliminated an early payment discount. (See Emergency Manager Order No. 24, attached as **Exhibit A**[1] to Defendants' Answer to First Amended Complaint, Doc. 24.) The City's Municipal Parking Department promptly implemented the changes.

Plaintiffs bring a putative class action alleging that the increased fines are unlawful. They seek recovery of their payments. The Court should dismiss this case for the following primary reasons:

- The City's 2014 changes to its parking fines schedule were entirely proper and lawful.   To the extent there was any uncertainty regarding the lawfulness of the City's 2014 changes to its parking fines schedule, the Detroit City Council eliminated this uncertainty when it enacted Ordinance 04-18 on April 18, 2018, which reaffirmed, retroactive to April 14, 2018, the changes made through Emergency Manager Order 24.

- Plaintiffs' lawsuit comes years too late and is barred by laches and the *Bigger* doctrine.

- Plaintiffs had the opportunity to raise defenses to their parking tickets and the amount of fines assessed, but they failed to do so, were determined to be liable, and voluntarily paid the tickets in full.   Plaintiffs' claims are therefore barred by res judicata and related doctrines.

---

[1] All references to exhibits in this brief shall refer to the Exhibits attached to the City Defendants' Answer and Affirmative Defenses to Plaintiffs' First Amended Complaint, Doc. 24. For the Court's convenience, additional copies of these exhibits are attached to this brief.   The City Defendants have also attached unpublished cases they have cited as appendices.

1

## STATEMENT OF FACTS

### I.     The Appointment of Kevyn Orr as Detroit Emergency Manager.

On March 14, 2013, following the City of Detroit's well-publicized descent into economic chaos, Governor Rick Snyder appointed Kevyn Orr as Emergency Manager (EM) of Detroit. (See Local Emergency Financial Assistance Loan Board Order 2013-5 Appointment of Emergency Financial Manager, attached as **Ex. P**.) As discussed below, state law conferred broad powers on the EM.

### II.     The City's bankruptcy.

On July 17, 2013, the City of Detroit filed a Chapter 9 Bankruptcy petition in the United States Bankruptcy Court for the Eastern District of Michigan, Case No. 13-53846.[2]

During the City's bankruptcy proceeding, the City observed that its parking violation fines were below those of other large cities.  The City announced that it planned to increase such fines to raise revenue needed for the plan of adjustment. (See Debtor's Amended Disclosure Statement with Respect to Amended Plan for the Adjustment of Debts of the City of Detroit (excerpts), filed as **Ex. L**.) City officials publicly announced the increases in March 2014.  See "Detroit could toughen parking fines," Crain's Detroit Business, March 18, 2014, filed as **Ex. D(2)**;

---

[2] The Court may take judicial notice of bankruptcy filings and other court filings. *Malin v JP Morgan*, 860 F.Supp.2d 574, 578 (ED Tenn. 2012).

"Detroit might increase parking fines, enforcement," CBS Detroit, March 18, 2014, filed as **Ex. D(3)**.)

### III.    Emergency Manager Order No. 24.

On April 3, 2014, the Emergency Manager issued Emergency Manager Order No. 24 amending Chapter 55 of the Detroit City Code by increasing the City's parking fines. Under the new fine schedule, basic parking fines were increased from $20.00 to $45.00, and the City's former practice of affording a $10.00 discount if fines were paid within 10 days was eliminated. (See **Ex. A**.) The Emergency Manager published the complete text of his order in the Detroit Legal News on April 8, 2014, showing which portions of the ordinance had been deleted and which portions had been added. (See **Ex. G**.) The publication also gave notice that a public hearing would be held on April 13, 2014 to inform the public of the changes. Id.

Further media accounts followed the publication of EM 24 prior to the public hearing. (See, e.g., "$45 parking tickets coming to Detroit," Crain's Detroit Business, April 7, 2014, **Ex. D(1)**; "Detroit parking war on the poor! Orr jacks up fines, ends 10-day grace; public hearing Mon. Apr. 14, 3 p.m.," Voice of Detroit, April 7, 2014, **Ex. D(4)**.) The public hearing that explained the parking fine changes took place as scheduled.   (See **Exhibit B**, page 3.)

3

## IV.    The Detroit City Council's Ordinance 09-14.

Plaintiffs in this lawsuit apparently argue that a completely independent ordinance, enacted by City Council at about the same time as EM Order 24, effectively nullified EM Order 24. Obviously, City Council had no authority to override EM Order 24, nor did it even purport to do so.

The ordinance in question is Ordinance 09-14, approved by the City Council on May 19, 2014.    The purpose of that ordinance was to incorporate the Michigan Uniform Traffic Code into a City Ordinance. (See Excerpts of Ordinance 09-14, **Ex. M**.) That action allowed the City to collect fines and costs for state law traffic violations, which had previously been collected by the State of Michigan. (Id.)

Ordinance 09-14 obviously was not intended to make any changes to the parking fines increased by EM Order 24.   Accordingly, when proposed Ordinance 09-14 was published, the publication did not show the new fines adopted by EM Order 24 being crossed out, nor did it show implementation of the former fines that had been replaced by EM Order 24. (Id.) Instead, the publication simply showed the prior version of the parking fine schedule which had been codified in the Detroit City Code prior to EM Order 24.   (Id.) The bottom line was that EM Order 24 remained in full force and effect.

4

**V.    The Bankruptcy Court's approval of the City's changes to its parking fines schedule.**

The City's increased parking fines schedule was an integral part of the City's plan for the adjustment of its debts in its bankruptcy proceeding. (**Ex. L.**) Later Bankruptcy Court filings also confirmed this. For example, the Bankruptcy Court appointed an expert, Martha E.M. Kopacz, to review the feasibility of the City's plan, and the expert filed a report summarizing her findings on July 18, 2014. (See Expert Report of Martha E.M. Kopacz Regarding the Feasibility of the City of Detroit Plan of Adjustment (excerpts), **Exhibit I**.) In her report, Ms. Kopacz noted that the City of Detroit had long lagged behind comparable municipalities in the level of its parking fines, but that it had raised its parking ticket fines on April 3, 2014, and anticipated that such increases would raise an additional $60.3 million in revenues over the next 10 years needed to satisfy claims of the City's creditors. (Id.)

Three months later, on October 22, 2014, the City filed its Eighth Amended Plan for the Readjustment of Debts (see excerpts attached as **Exhibit Q**). Again, this plan provided that the increased parking ticket revenues would be necessary to satisfy the claims of creditors. (Id.)

Approximately three weeks later, the Bankruptcy Court confirmed the City's Plan. (See Eighth Amended Plan for the Adjustment of Debts of the City of Detroit (excerpts), **Ex. N**.) **The Court's order noted that the anticipated parking fine**

**revenues would be deposited in a segregated fund and used to pay the principal and interest on "New C Notes" issued in partial satisfaction of claims of City creditors.** (Id.) In short, the City sold bonds to finance its plan of adjustment, using the increased parking revenue as security.

## VI.     Emergency Manager Order No. 44 ratifies EM Order 24.

On December 8, 2014, the Emergency Manager issued Emergency Manager Order No. 44 ("EM Order 44"). (See **Ex. C**.)   Paragraph 17 of this order provided that all prior EM Orders were incorporated and reaffirmed. (Id.)

## VII.   The plaintiffs and their parking tickets.

Plaintiffs allege that they received and paid parking tickets after the parking fine increases went into effect. (See Amended Complaint, ¶¶ 20-27, 29 - 32, 34 - 46.) Plaintiffs further allege that they were not afforded a discount by paying the fines within 10 days, which had been permitted under the former rescinded ordinance. (Id.)

The City has verified that it issued at least 19 parking tickets to vehicles owned by Ms. Friess and Ms. Timeus-McElroy during the period at issue.  (See tickets attached as **Exhibits K** and **S.**)  The City also issued parking tickets to other vehicles alleged to be owned by Plaintiff Haddadd (see **Exhibit R**), but the City has not verified whether these vehicles were owned by him or by another entity.

6

Each of the Plaintiffs concede that they did not request a hearing to contest any of the tickets, and never asserted any defenses to the tickets.   Instead, they voluntarily paid all of the tickets without asserting any legal or factual defenses. (See Amended Complaint, ¶¶ 20-27, 29 -32, 34 -46.)

## VIII.  The present lawsuit.

On December 21, 2017, Plaintiffs Kayla Friess and Issa Haddad filed the present lawsuit. (Doc. 1.)

On May 14, 2018, the original Plaintiffs, together with an additional Plaintiff, Melanie Timeu-McElroy, filed a First Amended Class Action Complaint (Doc. 24) against the City of Detroit, Norman White, who is the Director of the City's Municipal Parking Department ("MPD")(Amended Complaint, ¶ 12), James Canty, Jr., who is the manager of MPD's Parking Violations Bureau ("PVB") (Amended Complaint, ¶13), and Pierce, Monroe & Associates, LLC, which is alleged to be a corporation providing various services to MPD and PVB relating to the City's parking violations program. (Amended Complaint, ¶ 11).

The Amended Complaint asserts the following federal and state law claims:

Count I:        Municipal Liability for Violations of the Fifth, Eighth and Fourteenth Amendments to the US Constitution (42 U.S.C. §1983) (asserted against all Defendants);

Count II:       RICO (18 U.S.C. §1962(c)) (asserted against all Defendants);

Count III:          RICO Conspiracy (18 U.S.C. §1962(d)) (asserted against Defendants Pierce, Monroe & Associates, LLC, Norman White and James Canty);

Count IV            Unjust Enrichment (Common Law) (asserted against all Defendants);

Count V:            Assumpsit/Money Had and Received (Common Law) (asserted against all Defendants);

Count VI:           Fraud (Common Law) (asserted against Pierce, Monroe & Associates, LLC);

Count IX (sic):     Declaratory and Injunctive Relief.

Plaintiffs later voluntarily dismissed Pierce, Monroe & Associates (see Doc. 26), leaving the City of Detroit, Norman White and James Canty as the remaining Defendants.

## IX.    Ordinance 04-18 retroactively ratified EM Order 24.

As will be explained in this brief, the Emergency Manager's changes to the parking fines schedule were properly promulgated and legally effective.   However, out of an abundance of caution and in order to eliminate any uncertainty regarding the legal validity of the Emergency Manager's changes, on April 18, 2018, the Detroit City Council approved Ordinance 04-18, which reaffirmed the changes made through Emergency Manager Order 24, retroactively effective to April 14, 2018. (See Detroit City Council Resolution introducing ordinance clarifying Chapter 5 and

8

setting public hearing (April 10, 2018), attached as **Ex. O**; Notice of hearing on ordinance to clarify Chapter 55, Detroit Legal News, April 12, 2018, attached as **Ex. E**; Detroit City Council Resolution approving ordinance clarifying Chapter 5 (April 18, 2018), attached as **Ex. B**; and publication of ordinance clarifying Chapter 55, Detroit Legal News (April 25, 2018), attached as **Ex. F**).

For the reasons set forth below, the Court should dismiss Plaintiffs' Amended Complaint pursuant to Fed. R. Civ. P. 12(c).

## ARGUMENT

### I.     Standards applicable to motions for judgment on the pleadings.

Fed. R. Civ. P 12 (c) provides that:

> After the pleadings are closed - but early enough not to delay trial - a party may move for judgment on the pleadings.

Motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) are governed by the same standard as motions to dismiss under Fed. R. Civ. P. 12(b)(6). *Jelovsek v. Bredesen*, 545F.3d 431, 434 (6th Cir. 2008). In other words, judgment under Rule 12(c) is appropriate when the pleadings establish that no material issue of fact remains to be decided and the movant is entitled to judgment as a matter of law. *Beal v. Missouri Pacific R.R.*, 312 U.S. 45 (1941).

Fed.R.Civ.P. 10(c) provides that any exhibit to a pleading is a part of the pleading for all purposes. See *Sensations, Inc. v City of Grand Rapids*, 526 F.3d 291

(6th Cir 2008); *Burton v William Beaumont Hospital*, 373 F.Supp 2d 707, 717 (E.D. Mich 2005).

## II.   EM Order 24 was lawful and binding.

### A. The Emergency Manager possessed plenary authority over City financial matters, including parking violation fines.

Kevyn Orr was appointed Emergency Manager (EM) of Detroit on March 28, 2013 under Michigan Public Act 436 of 2012 (PA 436), MCL 141.1541 – 141.1575. The EM was empowered to "act for and in place and stead of" the City's Mayor and the Detroit City Council. MCL 141.1549(2).   The EM enjoyed "broad powers in receivership to rectify the financial emergency and assure the fiscal accountability of the [City] and the [City's] capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare." (Id.) Likewise:

> An emergency manager shall issue to the appropriate local elected and appointed officials and employees, agents, and contractors of the local government the orders the emergency manager considers necessary to accomplish the purposes of this act, including, but not limited to, orders for the timely implementation of a financial and operating plan * * *.

MCL 141.1550.

The authority granted to the EM was not encumbered by requirements traditionally imposed on city council.   The EM was authorized to exercise his powers "notwithstanding any charter provision to the contrary[.]"   MCL

141.1552(1).   Nevertheless, while not required, EM Order No. 24 was the subject of a public hearing, which was preceded by public notice which included the full text of the Order, showing which provisions were changed (through cross-outs) and what the new provisions were.   (**Ex. G**.) The fines at issue in this case were valid and lawful under Order No. 24.

### B. Emergency Manager Order No. 24 properly established new parking citation fines.

The EM determined "it is necessary and appropriate to revise (i) Chapter 55, Article II, Section 55-2-42 of the 1984 Detroit City Code (the "Parking Fine Ordinance") to increase parking fines to cover the necessary costs to process such fines and to increase funds available to the City…" (**Ex. A**, at p. 2.) The EM reasoned that the revisions were "necessary to safeguard and assure the financial accountability of the City." (Id.)

In issuing Emergency Manager Order No. 24 on April 3, 2014, the EM changed the fines for parking violations and eliminated the reduction for paying within 10 days. (Id. at pg. 5.) Parking violations, at a base level went from $20.00 (or $10.00, if paid within 10 days), to $45.00 (Id.) It is indisputable that the EM had legitimate reasons for raising the violation amount and had the authority to take such action. Plaintiffs give a terse description of the Order in their Amended Complaint,

11

but dismiss it, without analysis, as "never enacted or published" and therefore not law. (**Ex. A**) However, the EM was not subject to any procedural requirements applicable to the City Council. Furthermore, at the end of his term the EM issued Emergency Manager Order No. 44, which re-affirmed all prior orders. (**Ex. D**, Emergency Order No. 44).

### C. Ordinance 09-14 did not and could not nullify EM Order 24.

Plaintiffs' Amended Complaint alleges that Ordinance 09-14 effectively nullified EM Order No. 24.   The argument fails for multiple reasons.

<u>First</u>, the EM's statutory authority displaced all conflicting powers exercised by the City's Mayor or City Council. MCL 141.1549(2). The City Council had no power to "undo" EM Order 24 unless the EM expressly consented to such action. It is absurd to argue that the EM, by allowing Ordinance 09-14 to take effect, expressly consented to nullifying the increased parking rates he had just put into effect.   As discussed above, Ordinance 09-14 was passed for a completely separate revenue raising purpose, namely, to allow the City to capture traffic (not parking) ticket revenue arising from state law traffic violations.

Moreover, at the end of his tenure the EM reaffirmed Order 24, through Emergency Manager Order 44. (**Ex. C**.) EM Order 24 was always, and continues to be, binding and lawful.

12

Second, even if the City Council had the authority to undo EM Order 24 – which it did not – it did not purport to do so in Ordinance 09-14. Because Ordinance 09-14 was enacted by the City Council, it was subject to all Charter requirements, which include: "[a]ny ordinance which repeals or amends an existing chapter, article, division, or section of the Detroit City Code shall set out in full the chapter, article, or division, or section to be repealed or amended, and shall clearly indicate language to be omitted and language to be added." (**Ex. F**, *Detroit City Charter, Sec. 4-115*.) Such City Charter notice provisions require strict compliance. *See People v. Poyma*, 91 Mich. App. 238 (1979).

Ordinance 09-14 was adopted by the Detroit City Council on May 19, 2014, well after EM Order 24 took effect. Ordinance 09-14 as published included the **former** parking fine schedule.   Although the former fines had been replaced by EM Order 24's increased fines, the new fines had not been codified into the Ordinance.

Plaintiffs evidently believe that because Ordinance 09-14 lists the outdated fine schedule, those outdated fines somehow came back into effect and replaced the new fines implemented by EM Order 24. As shown above, the EM would have had to expressly approve such a bizarre result and he clearly never did so.   But, further, under the cited Charter provision, if the fines adopted by EM Order 24 were to be changed, the proposed ordinance would have to identify the **then-effective fines**

13

(those implemented by Order 24) **and** disclose the fact that those fines were being

**replaced by** the former fines – which had been eliminated by EM Order 24.

Proposed Ordinance 9-14 did **not** show the fines that had been adopted by EM

Order 24, **nor** did it show those fines being crossed out and replaced by the former

fines that preceded EM Order 24. (**Ex. M**, pp. 36-37.)   Indeed, the only significant

changes identified in the Ordinance are the addition of the Michigan Traffic Safety

Code. Plaintiffs' claim that Ordinance 09-14 nullified EM Order 24 fails under the

City Charter provision cited above.

### III.   To the extent there was any doubt whether EM Order 24 lawfully raised parking ticket rates in April 2014, which the City denies, that doubt was erased by the City's 2018 curative ordinance.

#### A. The City's 2018 Ordinance (Ex. B) retroactively cured any possible defect in the implementation of EM Order 24.

The City's 2018 curative Ordinance is appended as **Exhibit B**.   Section 55-

1-32(a) of the Ordinance recites the increased parking ticket fines and rates as

originally adopted by EM Order 24.   Section 55-1-32(b) of the 2018 Ordinance

recites the 2014 history of EM's Order No. 24 and the City's proper implementation

of the new parking rates.   Section (b) then states " * * * all actions previously taken

by the City, including the Emergency Manager and the Municipal Parking

Department and its staff, agents or representatives, relating to the establishment and

collection of parking fines and penalties for the late payment of fines in accordance

with Subsection (a) of the section [i.e., the **increased rates**] are affirmed."

The final section of the 2018 Ordinance (section 4, page 4) provides that the Ordinance "**shall be given retroactive effect April 14, 2014** [.]"

Hence, the 2018 Ordinance retroactively affirms the increased rates established by Emergency Manager Order No. 24. Even if there had been any deficiency in Emergency Manager Order No. 24, which Defendants deny, the 2018 Ordinance cured any possible defect.

### B. Both Michigan and United States Supreme Court authority expressly authorize enactment of the 2018 curative ordinance.

The Michigan Supreme Court first ruled on curative ordinances in 1939, stating "[r]etrospective statutes curing defects in acts done, or authorizing or confirming the exercise of powers, are valid where the legislature originally had authority to confer the power to authorize the acts, except where it is attempted to impair vested rights." *Stott v. Stott Realty Co.*, 288 Mich. 35, 45 (1939). Both the Michigan and United States Supreme Courts upheld retroactive curative legislation in *Romein v. General Motors*, 436 Mich. 515 (1990), affirmed in *General Motors Corp v. Romein*, 503 U.S. 181 (1992).

A few years later, the Michigan Supreme Court upheld a municipality's retroactive curative resolution in a case that is dispositive here, *Downriver Plaza Group v. City of Southgate,* 444 Mich. 656 (1994).

15

In April 1988, Southgate's City Council passed a resolution implementing user charges for to pay for operation and maintenance of recently constructed drains. Plaintiffs paid the 1987 and 1988 charges but thereafter sued for refunds.   Plaintiffs argued, and the trial court agreed, that the April 1988 resolution was invalid. Specifically, the resolution was in violation of the city's charter because it failed to incorporate the rate for user charges into the relevant resolutions. *Id* at p. 660.

Shortly after the court's ruling, the city passed a retroactive curative ordinance that comported with the Charter's requirements. Based on that curative ordinance, the trial court dismissed the plaintiffs' refund lawsuit. The Michigan Court of Appeals reversed (relying on outdated law), but the Michigan Supreme Court reinstated the lower court's ruling dismissing the lawsuit. The Michigan Supreme Court summarized its decision as follows:

> The plaintiffs claim that the assessments on their 1987 and 1988 tax bills are invalid. We disagree. Southgate had the authority to levy user fees in 1987 and thereafter, and, while the implementation of the user charge system was initially deficient, the 1990 resolution satisfactorily corrected the defect. Moreover, this Court finds that the retroactive application of the 1990 resolution is justified. Thus, we reverse the Court of Appeals decision, and hold that the assessments for years 1987–91 are valid.

Id at p. 661.

Plaintiffs argued that the retroactive resolution violated their right to due process of law.   The Michigan Supreme Court rejected that argument based on its,

16

and the United States Supreme Court's decisions, in *Romein, supra*.   The Michigan

Supreme Court explained:

> We begin our analysis of plaintiffs' due process claim with mention of
> the applicable standard of review. We construe the Southgate City
> Council's January 3, 1990, resolution to be an economic legislative
> measure. When scrutinizing economic and social legislation, this Court
> applies the rational basis standard of review. Applying this standard,
> the resolution "'come[s] to the Court with a presumption of
> constitutionality,' " and "the burden is on the one complaining of a due
> process violation to establish that the legislature has acted in an
> arbitrary and irrational way."

Id at p. 666, citations omitted.

The Court observed that retroactive legislation could raise special concerns if

it "deprive[d] citizens of legitimate expectations and upset settled transactions."   Id.

Nevertheless, "In affirming our decision in *Romein,* the United States Supreme

Court articulated the due process test for retroactivity as follows: "a legitimate

legislative purpose furthered by rational means."" Id at 667.

Here, the City's 2018 curative ordinance epitomizes "a legitimate legislative

purpose furthered by rational means." Id at 667. The Emergency Manager

unquestionably had the legal right in 2014 to increase parking fines to address the

City's financial emergency.   The increased fines were an integral part of the City's

Bankruptcy Plan of Adjustment which was confirmed by the Bankruptcy Courts and

upheld by the Sixth Circuit.   While the City contends that EM Order 24 was fully

valid and binding when issued in 2014, enactment of the 2018 curative ordinance was a "rational means" to correct any possible defect and preserve the critical revenue raised by EM Order 24.

The *Downriver Plaza* plaintiffs argued that they had been not required to pay drain and sewer maintenance fees from 1980-1987.   Plaintiffs asserted they relied on that fact and developed an expectation – which they posited as a "vested right" - that they would not be charged to use and maintain the drains. The Michigan Supreme Court rejected that argument:

> Plaintiffs' reliance did not give rise to a vested right. The plaintiffs may have hoped that they would never be charged for drain usage. * * * But for the charter violation, Southgate's collection of fees would have been proper in 1987, and would not have infringed on any legitimate rights of the plaintiffs. Similarly, when, on January 3, 1990, Southgate retroactively validated collected fees for 1987–89, it did not abrogate any vested rights belonging to the plaintiffs.

Id at p. 669.

Here, the *Friess* plaintiffs never had any "right," let alone a "vested right," to pay any particular amount of parking fines.   Plaintiffs were, at all times, fully on notice of the increased amounts of the fines **because they voluntarily paid those fines!**   In other words, the 2018 Ordinance may be retroactive in form, but it was not retroactive in substance. Plaintiffs are not being asked to pay any additional amounts beyond what they already paid.

18

Finally, the Michigan Supreme Court bolstered its conclusion that retroactive application of the Southgate resolution was valid, by noting "the inequities that would result" otherwise.   Id at p. 670.   Specifically, Southgate would have had to refund $1.7 million that Southgate did not have, because it had turned the money over to Wayne County.

Likewise, here, the City used the increased parking fine revenue to pay creditors under the Plan of Adjustment. The City cannot get a "do-over" on the Plan of Adjustment. If, indeed, there was some defect in EM Order 24 (which is denied), it would be inequitable to prevent the City from retroactively curing that alleged defect.[3]

## IV.   Plaintiffs' claims are barred by laches and the Bigger doctrine.

In *Bigger v. City of Pontiac*, 390 Mich 1 (1973), plaintiffs sued to enjoin the issuance of bonds sold to support the construction of the Pontiac Silverdome. The suit was filed within weeks after the bonds had been sold and a month before they were to be delivered.   The trial court rejected the lawsuit as untimely and the Michigan Supreme Court affirmed:

---

[3] Other federal courts have upheld similar retroactive curative ordinances adopted by municipalities using identical reasoning. See *Jasinski v City of Miami*, 269 F.Supp.2d 1341 (S.D. Fl. 2003) (upholding retroactive application of Miami's curative ordinance confirming imposition of administrative towing fees).

19

> In cases where because of the nature of the subject matter, absolute time limits must be observed, the law requires speedy resort to the courts by those who wish to prevent or modify contemplated transactions or procedures. Cf. O'Brien v. Skinner, 409 U.S. 1240, 93 S.Ct. 79, 34 L.Ed.2d 211 (1972) per Marshall, J. as Circuit Justice.
>
> Those who would avail themselves of our processes must do so in a manner which facilitates an orderly process of adjudication within the given time frame.
>
> *     *     *
>
> We are of the opinion that in cases of this kind, if the plaintiff fails to resort to the courts without delay (within the context of the time available for adjudication) the courts may refuse to entertain the case. This power is, of course, to be exercised cautiously, circumspectly and only in the kind of unusual situation with which we are now presented.

*Id* at pp. 4-5.

In *Ford Building v. Wayne County*, 1999 WL 33435466 (Mich. App. 1999), Appendix 1, plaintiffs sued to recover taxes paid under a Jail Millage Tax alleged to be illegal.   The suit was brought years after the tax had been levied and its proceeds used to construct a juvenile facility. The Court observed (at *2):

> Finally, plaintiffs argue that the trial court erred in finding that plaintiffs' lawsuit was barred by laches and the doctrine of *Bigger v. City of Pontiac,* 390 Mich. 1; 210 NW2d 1 (1973). There is no merit to plaintiffs' claim that the *Bigger* doctrine should be limited to situations where plaintiffs seek to enjoin the sale or delivery of bonds. The *Bigger* doctrine was "designed to deal with challenges which could prevent or frustrate public improvements in general." *Walled Lake Consolidated School District v Charter Township of Commerce,* 174 Mich.App 434, 436-437; 437 NW2d 16 (1989). Nor did the trial court err in determining that plaintiffs' claim was barred by laches. Defendant

20

asserted throughout these proceedings that it has relied on the millage funds since 1988 to pay for improvements at the existing facility, provide some of the funding for the new facility, and establish community programs that provide preventative and rehabilitative services to juveniles. The trial court did not err in determining that it would be inequitable to enforce plaintiffs' claim against defendant because defendant's position had changed materially during the nine years since the passage of the Jail Millage Tax and the filing of plaintiffs' complaint. *Lothian v. Detroit,* 414 Mich. 160, 168; 324 NW2d 9 (1982). See also *Bylinski v. Allen Park,* 169 F3d 1001 (CA 6, 1999)."

This is unquestionably a case where, "because of the nature of the subject matter, absolute time limits must be observed, the law requires speedy resort to the courts by those who wish to prevent or modify contemplated transactions or procedures." *Bigger* at pp. 4-5.   In 2014, the City was embroiled in a very public bankruptcy in which the City's financial future was at stake.   The City had one and only one opportunity to restructure its finances so that it could emerge as a viable city – able to provide basic public services and improvements for its citizens.

The voluminous bankruptcy record recites in detail the City's enormous problems in providing citizens with adequate public safety services and dealing with abandoned properties, blight, and other basic quality of life issues.   United States Bankruptcy Judge Steven Rhodes, who presided over the case, wrote as follows following a bus tour of the City:

The primary impression that remains with the Court following the tour is that blight in Detroit is extensive. The statistics do not fully convey

21

> its extent or impact. In neighborhood after neighborhood, short and
> long stretches of streets have abandoned structures—they can no longer
> be called homes—that are intimidating hulks. Some are partially or
> mostly burned out. Some have gaping holes in their roofs or collapsed
> garages. Many have missing doors and windows, and broken front steps
> and porches. Some are strewn with illegal dumping. All are vivid
> statements of their former owners' emotional and financial struggles,
> and of community loss.

*In re City of Detroit*, 524 B.R. 147,167 (Bankr. ED Mich 2014).

The negotiations that resulted in the final Plan of Adjustment were difficult and intense.   City retirees saw cuts in their retirement benefits, mitigated in part by the "Grand Bargain." Some corporate creditors sustained losses of hundreds of millions of dollars. Judge Rhodes ultimately found the plan of adjustment – which included the enhanced parking ticket revenue - to be "feasible." But the Judge and his appointed feasibility expert acknowledged that the City's prospects for success in complying with the plan were by the narrowest of margins. See *In re City of Detroit*, 524 B.R. 147 (Bankr. ED Mich 2014), at pages 219 ("little space remaining on the continuum of [feasibility]"); page 220 (City was and remains "enmeshed in a financial crisis of unsurpassed proportions and complexity"), page 231 ("narrow margin for error" for City to successfully exit from bankruptcy), page 242 (Mayor Duggan testified that the City is "probably about ten percent of where we need to be" in terms of providing adequate City services).

One key part of the Plan called for selling bonds ("New C Notes") on the

22

strength of the revenue to be raised by EM Order 24. (**Ex. N**.) That revenue was to be deposited in a segregated fund to secure the designated creditors' receipt of the monies. (**Ex. N**.)

EM Order 24, which increased the parking fines, was publicly announced in **April 2014.** The Plan of Adjustment was not finally approved until **November 2014**. If Plaintiffs – or any other member of the purported "class" – thought there was some problem with the increased parking fines, they were obligated by *Bigger* to raise that issue immediately - not four years later after the Plan of Adjustment has been implemented, the New C Notes sold and the proceeds distributed.

**V.    Plaintiffs' claims are barred by res judicata or claim preclusion.**

The doctrine of res judicata "provides that a final judgment on the merits of an action precludes the 'parties or their privies from relitigating issues that were or could have been raised' in a prior action." *Kane v. Magna Mixer Co.,* 71 F.3d 555, 560 (6th Cir.1995) (quoting *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981)). Res judicata applies to cases involving civil infractions. *Leach v. Manning,* 105 F.Supp.2d 707, 712–13 (E.D.Mich.2000). When the relevant prior action is a state-court proceeding, application of res judicata triggers the "Full Faith and Credit Clause" of Article IV, section 1 of the United States Constitution as well as 28 U.S.C. § 1738, which requires "federal courts to

give preclusive effect to the state-court judgments whenever the courts of the State from which the judgments emerged would do so." *Haring v. Prosise,* 462 U.S. 306, 313, 103 S.Ct. 2368, 76 L.Ed.2d 595 (1983) (quoting *Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980)). For this reason, federal courts apply the res judicata rules adopted by the state courts in which the prior proceedings took place. *Brookins v General Motors Corp.*, 843 F.2d 879 (6th Cir. 1997)

Under Michigan law, res judicata involves four discrete elements: "(1) the prior action was decided on the merits, (2) the decree in the prior decision was a final decision, (3) both actions involved the same parties or their privies, and (4) the matter in the second case was or could have been resolved in the first." *Ditmore v. Michalik,* 244 Mich.App. 569, 625 N.W.2d 462 (Mich.Ct.App.2001).

Each of these elements is satisfied in the present case. First, the tickets issued to Plaintiffs were decided on the merits, as Plaintiffs were found responsible for each parking violation in the amounts stated on the tickets as a result of their payments. Second, the rulings on the tickets were final decisions.   Third, the prior tickets and this action involve the same parties.[4]   Finally, Plaintiffs had the opportunity to raise

---

[4] It is true that neither Norman White nor James Canty were parties to the proceedings involving Plaintiffs' tickets.   However, as employees of the City of Detroit, they are deemed to be in privity with the City. See, e.g*., Motuelle v. Ruffini,* 2004 WL 1254304 (Mich. Ct. App. 2004) (per curiam) (Appendix 7).

the same core claim asserted here – that the new fine schedule had not been properly enacted – but chose not to do so.

Courts have dismissed cases as barred by res judicata under facts very similar to those involved here. For example, in *Coatney v City of Dearborn*, 2009 WL 322032 (E.D. Mich 2009) (Appendix 2), the plaintiff received multiple parking tickets for parking at a bus stop. The City of Dearborn ticketed the plaintiff under Michigan Uniform Traffic Code R. 28.1819, which was part of a group of model ordinances, but the city had not actually adopted the provision at issue. The plaintiff was found responsible in state proceedings. He then filed suit in federal court, asserting various constitutional and other claims.  In particular, the plaintiff asserted, much as Plaintiffs do in this case, that the ordinance under which he was ticketed had not been adopted at the time he was issued the tickets.

The Eastern District of Michigan (Judge Zatkoff) dismissed the case, stating:

> Plaintiff's claim that R. 28.1819 is unenforceable because it was never adopted would have conceivably provided Plaintiff with an absolute defense to the citations he received and ***should have been made in conjunction with Plaintiff's defense in the state-court proceedings***. The Court finds that, under Michigan law, the requirements for the application of res judicata are present in this case and therefore, Plaintiff's action must be dismissed.

*Coatney v City of Dearborn*, supra, at *3. (Emphasis added.)

In rendering its decision, the Court in *Coatney* relied on a similar case, *Leach*

25

*v Manning*, 105 F.Supp.2d 707 (E.D. Mich 2000). In that case, the plaintiffs received tickets from the City of Pontiac for ordinance and housing code violations, and were found responsible for several of them. The plaintiffs later filed suit in federal court, alleging various federal and state claims. The Eastern District of Michigan (Judge Rosen), dismissed the claims as barred by res judicata, stating:

> In the context of each such citation that has been the subject of a state court proceeding, ***Plaintiffs could have raised—and perhaps did raise—their argument that Pontiac's ordinances are unenforceable*** as to their property. This argument, if accepted, would be a complete defense to the civil infractions charged against Plaintiffs. Plaintiffs' opportunity to assert this defense in the state court proceedings—an opportunity Plaintiffs have not denied—precludes any further litigation on the question whether Plaintiffs' property is subject to the City's ordinances.

*Leach*, supra, at 713. (Emphasis added.)

The Sixth Circuit has issued similar rulings. For example, in *Lavrack v City of Oak Park*, 194 F.3d 1313 (6th Cir. 1999), the plaintiff received multiple tickets for various civil infractions, was found responsible and ordered to pay fines. She later filed a federal civil rights complaint against the governmental entities that had issued the tickets. The Court stated:

> Michigan's doctrine of res judicata precludes Lavrack from relitigating her challenge to the determination that she was responsible for the ticketed infractions. . . . Here, Lavrack was found to be responsible for the ticketed Garden City infraction. In addition, ***she failed to contest her responsibility for the Oak Park infractions, even though she could have raised such a challenge had she appeared in court.*** She now

26

seeks to reassert a challenge to her responsibility for the ticketed infractions, alleging that the defendants acted improperly. Because the essence of Lavrack's challenge was decided in earlier proceedings, Michigan law would preclude Lavrack from raising a challenge in any subsequent action.

*Lavrack v City of Oak Park*, 194 F3d 1313 (citations omitted, emphasis added.)[5]

As in the cases cited above, Plaintiffs had the opportunity to assert defenses to the tickets they were issued – including the argument that the increased fine schedule had not been properly enacted - but failed to do so. Their claims are therefore barred by res judicata.

VI. **Counts II (for violation of RICO) and III (for RICO Conspiracy) against Defendants White and Canty fail because (1) there was no unlawful conduct and hence, no "racketeeing activity;" and (2) these are disguised "official capacity" claims against the City.**

Count II and III of Plaintiffs' Amended Complaint seek recovery against

---

[5] This Court has also issued similar rulings.   For example, in *Costa v City of Detroit*, 2013 WL 318042 (ED Mich 2013) (Appendix 8), the plaintiff challenged the City of Detroit's authority to demolish his building.   A Michigan court ruled that the City had such authority.   This Court dismissed Plaintiff's later federal lawsuit arising from the same facts, stating:

> Res judicata is appropriately applied here. . . . Costa *could* and *should have* asserted his federal claims when the circuit court's order authorizing the demolition of the buildings became final. His failure to do so now precludes him from readdressing those issues here.

*Costa v City of Detroit*, supra, at *4 (Judge Hood) (emphasis is original).

27

Norman White and James Canty for violation of the Racketeer Influenced and
Corrupt Organizations Act ("RICO") and RICO conspiracy, respectively. The civil
RICO statute, 18 U.S.C. § 1962(c), states it is "unlawful for any person employed
by or associated with any enterprise engaged in" activities affecting "interstate or
foreign commerce to conduct or participate, directly or indirectly, in the conduct of
such enterprises affairs through a pattern of racketeering activity...." To assert a civil
claim under RICO, a plaintiff must plead the following elements: "(1) conduct (2)
of an enterprise (3) through a pattern (4) of racketeering activity." *Moon v. Harrison
Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006), quoting *Sedima, S.P.R.L v. Imrex
Co., Inc.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). RICO defines
racketeering activity to include any act that is indictable under certain provisions of
title 18 of the United States Code, including wire fraud, 18 U.S.C. § 1343, and mail
fraud, 18 U.S.C. § 1341.

The Court must dismiss Plaintiffs' RICO counts for the following reasons.

First, for the reasons explained above, the City's parking ticket fines were not
unlawful. Therefore, the alleged conduct of Mr. White and Mr. Canty relating to
the fine schedule were not unlawful and cannot constitute "racketeering activity."

Second, district courts within the Sixth Circuit have held that a civil RICO
claim cannot be brought against a municipal corporation, because a governmental

28

entity is incapable of forming the malicious intent necessary to state such a claim. See, e.g., *Cargile v. State of MI*, 2010 WL 3222024 (ED Mich 2010) (Morgan, V.) (Appendix 3). The same RICO bar applies to "official capacity" suits against municipal employees or officers. *Call v Watts*, 142 F.3d 432 (6th Cir. 1998) (a plaintiff cannot sue "members of [a governmental entity] in their official capacities [because government entities] are not persons under RICO because they lack the 'the capability to form the *mens rea* requisite to the commission of the predicate acts.") (citations omitted).

The Amended Complaint names Norman White (White) and James Canty (Canty) in both their individual and official capacities.  However, the complaint alleges that those two individuals acted in their official capacities on behalf of the City to assess and collect the parking fines (Doc. 20, ¶¶ 69, 72) without describing any actions they took in their individual or personal capacities.  The RICO claims at Counts II and III simply allege that those two city employees are "RICO individuals," that the alleged RICO "enterprise" is the Municipal Parking Department (MPD) and Parking Violations Bureau (PVB), and that Defendants White and Canty ran the MPD and PVB to collect fines not authorized by ordinance. The assessment and collection of parking fines is an activity that was done, and can only be done by the City of Detroit.  In other words, while Counts II and III of the

29

Amended Complaint purport to assert claims against Defendants White and Canty in their individual capacities, because these Defendants' alleged unlawful conduct - sending inaccurate violation notices – was conducted in course of the performance of their official duties, these are in reality "official capacity" claims that must be dismissed.

In similar circumstances, several district courts have found that mere performance of official duties will not support a civil RICO claim against public officials.   In *Iraheta v Linebarger Goggan Blair & Sampson LLP*, ____ F.Supp.3d ____, 2017 WL 4479953 (S.D. Texas 2017) (Appendix 4), the plaintiff sued taxing authorities and their collection agents under Section 1983, RICO and other laws. The court granted summary judgment on the RICO claim against the individual defendants, whom the court had previously held were acting as agents of the government entities. The Court reasoned that because the plaintiff could not as a matter of law satisfy the *mens rea* requirement as to the governmental entity, the plaintiff could not prove a RICO violation against the individuals who were acting on behalf of the governmental entity.

In *Quan v San Franciusco Police Dept.*, 2012 WL 4477621 (N.D. Cal. 2017) (Appendix 5), the plaintiffs alleged a RICO claim against San Francisco and certain police officers alleging a scheme to raid nightclubs under the pretext of liquor

violations.   After finding that the governmental entities were not subject to RICO

(as in the Sixth Circuit and elsewhere), the Court dismissed the RICO claims against

the mayor and two police officers sued in their individual capacity, reasoning as

follows:

> To the extent that Plaintiffs argue that in *Pedrina* [*v. Chun*, 97 F.3d
> 1296, 1300 (9th Cir.1996)] the court allowed the RICO claim against
> the mayor to proceed, Plaintiffs are correct. However, in that case the
> plaintiffs alleged conduct by the mayor outside of his official duties,
> namely taking bribes and aiding and abetting other defendants in a
> mail fraud scheme. See *Pedrina*, 97 F.3d at 1300. Here, as Defendants
> point out, Plaintiffs have not alleged any action taken by Ofc.
> Bertrand that was not taken on behalf of the City and County of San
> Francisco. The same holds true for Plaintiffs' allegations regarding
> Investigator Ott and former Mayor Newsom. Thus, Plaintiffs'
> allegations regarding these defendants all concern conduct taken in
> their official roles. In such instances, "[s]uing a government official in
> his official capacity is the equivalent of suing the government, and the
> government cannot form the requisite intent to be sued under RICO."
> *Tate v. Bd. of Prison Terms*, 2010 WL 1980141, at *13 (C.D.Cal.
> April 9, 2010) (citing *Pedrina*, 97 F.3d at 1300). Plaintiffs have not
> cited to any case law holding that a government employee could be
> held liable under RICO for performing his or her official duties.
> Accordingly, the Court finds that Plaintiffs' RICO claim against Ofc.
> Bertrand, Investigator Ott, and former Mayor Newsom is subject to
> dismissal.

Also see *Hirsch v City of New York*, 300 F.Supp 3d 501 (SDNY 2018) (dismissing

RICO claims against municipal employees where "Plaintiff in no way plausibly

alleges that individual defendants engaged in tortious conduct independent of the

office they hold."); *Novel v Zapor*, 2016 WL 6603291, at *3 (SD Ohio 2016)

(Appendix 6) (dismissing RICO claim against judge where "Plaintiff has not pleaded any facts alleging that Judge Eyster actually benefitted from" the allegedly unlawful conduct.)

In the present case, there are no allegations that Defendants White or Canty derived any personal benefit, that they solicited or collected bribes, or were paid additional compensation for the alleged over billing. There are no allegations that they acted for any purposes other than to impose and collect parking fines for the City of Detroit, which were part of their official duties. In other words, there is nothing truly at issue in this case other than official conduct of the City. Plaintiffs cannot evade the rule barring RICO suits against municipalities simply by mischaracterizing actions taken by the City's employees in the scope of their duties as individual capacity claims.

## VII. The Court must dismiss Count IV (for Unjust Enrichment) because the City has not been unjustly enriched.

In Count IV of their Amended Complaint, Plaintiffs seek recovery for unjust enrichment. To establish a claim of unjust enrichment under Michigan law, a plaintiff must establish (1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant. *AFT Mich. v. Michigan*, 303 Mich. App. 651, 677; 846 N.W.2d 583 (2014), aff'd sub nom *AFT Mich. v. State of Michigan*, 497 Mich. 197 (2015).

32

Quite simply, there is no inequity or injustice in the City retaining the parking fines revenue, because the City's parking fines schedule were not unlawful, for the reasons stated above.   Therefore, this count fails.

### VIII. The Court must dismiss Count V of Plaintiffs' Amended Complaint, for Assumpsit, because assumpsit has been abolished as an independent cause of action under Michigan law.

Count V of Plaintiffs' Amended Complaint asserts a Michigan common law claim for assumpsit/money had and received. However, as of 1963, assumpsit was abolished as an independent cause of action.   *Fisher Sand and Gravel Company v. Neal A. Sweebe, Inc*., 494 Mich. 543, 564; 837 N.W.2d 244 (2013).   Therefore, the Court must dismiss Count V.

### CONCLUSION AND RELIEF REQUESTED

For the reasons stated above, Defendants, the City of Detroit, Norman White and James Canty, Jr., request that the Court grant their motion for judgment on the pleadings pursuant to Fed.R.Civ. P. 12(b)(6).

/S/ Eric B. Gaabo
Charles N. Raimi (P29746)
Eric B. Gaabo (P39213)
Attorneys for City Defendants
Coleman A. Young Municipal Center
2 Woodward Avenue, Suite 500
Detroit, MI 48226
gaabe@detroitmi.gov
(313) 237-3052

Dated:   August 8, 2018

## CERTIFICATE OF SERVICE:

## DEFENDANTS CITY OF DETROIT, NORMAN WHITE AND JAMES CANTY'S MOTION FOR JUDGMENT ON THE PLEADINGS and BRIEF IN SUPPORT

I state that on August 8, 2018, I served Defendants City of Detroit, Norman White and James Canty's Motion for Judgment on the Pleadings and Brief in Support on the other parties to this case by electronically filing these documents with the U.S. District Court for the Eastern District of Michigan, which will forward these documents to all parties of record through its electronic e-filing system.

Respectfully submitted,

S/Eric B. Gaabo
Charles N. Raimi (P29746)
Eric B. Gaabo (P39213)
Gaabe@detroitmi.gov
Attorneys for Defendants City of Detroit, Norman White and James Canty
City of Detroit Law Department
2 Woodward Avenue, Suite 500
Detroit, MI 48226
(313) 237-3052

Dated:        August 8, 2018